United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOANNE CONWRIGHT,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND, et al.,<br><br>　　　　　　Defendants. | NO. C09-2572 TEH<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANT CITY OF<br>OAKLAND'S MOTION FOR<br>SUMMARY JUDGMENT |

This matter comes before the Court on Defendant City of Oakland's motion for summary judgment. After carefully reviewing the parties' written arguments, the Court finds oral argument to be unnecessary and now VACATES the January 23, 2012 hearing.[1] The motion is GRANTED IN PART and DENIED IN PART as discussed below.

**BACKGROUND**

Plaintiff Joanne Conwright is an African-American female who was 62 years old at the time of the incidents at issue. She worked for Defendant City of Oakland for nineteen years, most recently as the administrative services manager for the building services division of the City's Community and Economic Development Agency ("CEDA"). The now-operative third amended complaint alleges sexual harassment, hostile work environment, retaliation, and age discrimination causes of action against the following Defendants: the City; Jeffrey Robinson, a temporary employee hired by the City whom Conwright contends sexually harassed her; Ray Derania, who was Conwright's supervisor during the relevant time period; Antoinette Renwick, one of Conwright's former co-workers; and Cherry Hall,

---

[1] Conwright's request to continue the January 23 hearing is therefore DENIED as moot.

1  who handled personnel issues for CEDA.² The Court dismissed all claims against Hall for
2  failure to state a claim on May 31, 2011. Although one claim was dismissed with leave to
3  amend, Conwright chose not to file an amended complaint. The Court dismissed all claims
4  against Renwick and Derania for failure to effect service on June 2, 2011. Thus, the only
5  remaining Defendants are Robinson and the City.

6  Robinson was hired through Act One, a temporary staffing agency, to work in
7  CEDA's building services division in January 2008. His initial contract was for two months,
8  and he reported to Sandra Smith. His duties included "clerical work, data input and working
9  with Excel spreadsheets." Robinson Decl. ¶ 2. The parties do not dispute that Robinson was
10 looking to gain a permanent position with the City, and that Conwright offered to help him
11 with his resume, which she contends she had typically done with other temporary employees.
12 From there, however, the parties' versions of the interactions between Robinson and
13 Conwright differ.

14 Robinson states that he worked at a cubicle that was approximately midway between
15 the two main exits from the restricted area of the building to the public area. Conwright
16 asserts that Robinson worked in a cubicle within 30 feet of an exit door, and that her office
17 was located near the exit door at the other end of the floor. She claims that:

> There was no reason for Robinson to constantly come pass [sic] my office to exit the floor or to go to the restroom. Robinson went out of his way to come by my office. He appeared at my office unannounced and uninvited three to four times a day. He persistently, [sic] asked if I had work for him to do when I was not his supervisor. There were times when he questioned me about my whereabouts, and my schedule. Even though Robinson knew where the restroom was located, he persisted in coming by my office, stopping to say "hello" or waving at me, or smiling at me, and winking at me. I began to feel increasingly uncomfortable with the increasing frequency of his actions.
>
> . . . . On at least two or more occasions Robinson entered my office, forcing me to direct him to leave. On one occasion while meeting with another person, Robinson stopped by and said "hi," interrupting the meeting, and forcing me to direct him to leave. Robinson *leered* at me in a manner that was inappropriate and

---

²The complaint names Cheryl Hall Tongue as a Defendant. The Court now refers to her as Cherry Hall, the way she identifies herself in her declaration.

2

> suggestive of a sexual interest. His excessive interest and attention seemed like he was expressing a desire for my attention and me as a woman. He would follow me around the office. He did these things several times per day, when we were both in my office area.

Conwright Decl. ¶¶ 9-10.

Robinson contends that he would sometimes use the exit door by Conwright's office to use the restroom because the other exit door opened to the area where the public service desk was located. He states that Conwright would leave her office door open, and he would wave and say hello as he passed by, sometimes chatting for a minute or two, because he was a friendly person. He said that he "never forced [his] way" into her office, "never leered at Ms. Conwright or attempted to touch her," and "never made sexual jokes or suggestive comments to her." Robinson Decl. ¶¶ 8, 11. He "never intended to say anything or do anything to Ms. Conwright because she was a woman or because [he] had a sexual or romantic interest in her." *Id.* ¶ 8.

Conwright first complained to Smith, who was Robinson's supervisor, about Robinson's behavior on March 10, 2008. There is no evidence that anything was done as a result of this complaint, which the City contends did not occur. *See* Smith Decl. ¶ 11 (March 18, 2008 "was the first time Ms. Conwright complained to me about Mr. Robinson").

Conwright was out on a prearranged vacation from March 14 to March 17. When she returned to work, Robinson approached her, saying "You're back. I thought you would be gone longer. I'm glad you're back," which prompted Conwright to complain to Smith about Robinson for a second time. Conwright Decl. ¶ 14. Smith "spoke to Mr. Robinson the same day and told him to stay away from Ms. Conwright." Smith Decl. ¶ 12.

Nonetheless, Conwright asserts that, on March 19 and 20, Robinson "kept coming to my office area stopping and saying 'hi' and waving and winking at me." Conwright Decl. ¶ 15. On March 21, Conwright again complained of harassing behavior to Smith, as well as to Cherry Hall.

After that complaint, Smith, Robinson, and Conwright met to discuss the situation. Conwright told Robinson that she "felt he was sexually harassing [her], and that he must stop

3

and must leave [her] alone." *Id.* ¶ 17. Robinson apologized, but Conwright did not believe he was being truthful. Smith subsequently met separately with Conwright, who "told [Smith] that she was satisfied with Mr. Robinson's apology and that he could continue working. She said there was no need to terminate Mr. Robinson's contract." Smith Decl. ¶ 14.

Robinson claims that he "never attempted to interact with Ms. Conwright again" after his meeting with Conwright and Smith. Robinson Decl. ¶ 14. However, Conwright states that, on March 25, Robinson "again walked slowly by [her] office," which caused her to realize that he "was breaching the agreement to stop the harassment and [she] began to be frightened and scared of Robinson." Conwright Decl. ¶ 18. She filed a sexual harassment claim with Cheryl Thompson, the Assistant City Administrator, later that same day.

Robinson feared that Conwright's accusations against him would prevent him from getting a permanent job with the City, so he wrote a letter on March 25, 2008, to CEDA's director, Dan Lindheim, to explain his version of events. Ex. 8 to Lee Decl. He did not address the letter to Conwright because he "did not want to have any interactions with her." Robinson Decl. ¶ 16. Conwright nonetheless learned about the letter later that day and believed that Robinson was retaliating against her for reporting his conduct.

On March 26, Conwright left a voicemail message for Judy Jackson, who works in the City's Equal Opportunity Programs Division ("EOPD"), alerting Jackson that Conwright had filed a harassment complaint. She also sent an email that afternoon to Hall, Smith, Renwick, and Arnita Fermin, who worked in CEDA's human resources unit, stating that Robinson should be released the following day because "[w]e no longer need his services." Ex. 11 to Lee Decl.

On March 27, Conwright arrived at work and saw that Robinson had not been released as she directed. She sent an email to Hall and Fermin, saying, "Jeffrey B. Robinson is here today. Get him out of here immediately. I am in fear of my life with this man." Ex. 12 to Lee Decl. Conwright states that "[n]o meaningful and real attempt was made to address my complaints and my concerns," and she therefore complained again to Fermin and Jackson, requesting that Robinson be immediately released. Conwright Decl. ¶ 22.

4

It is undisputed that Robinson was subsequently reassigned to CEDA's housing division, which was located on the fifth floor of the same building; that he worked there until his employment with the City ended on April 30, 2008; and that he has not returned to work with the City since that time. Conwright claims that Robinson's move to the fifth floor was an inadequate solution to her concerns because she had to visit that floor to conduct her duties and Robinson was positioned at the front desk, where she was certain to see him. Conwright Decl. ¶ 23; *but see* Robinson Decl. ¶ 18 ("My workstation on the fifth floor was a cubicle and was in an area that was not accessible by the public. I did not sit near the entryway that was closest to the elevator.").

On March 28, Conwright complained again to various supervisors that she feared for her safety and called the police to report the alleged harassment. Don Jeffries, the EOPD manager, responded by email that he had already "immediately assigned" an investigator to look into Conwright's complaint and "asked that Mr. Robinson be reassigned during our investigation as a direct result of your indication that you feared for your life. I also contacted Deb Grant, the Risk Manager, to convey your concerns. She has initiated a threat assessment." Ex. 3 to Conwright Decl. at 2. He concluded by saying that, "At this time however, there is no basis for removing Mr. Robinson from his employment until we have determined that there has been some misconduct." *Id.* Conwright ultimately received paid administrative leave from March 31 through April 7, worked two days on April 8 and 9, and was off work on sick or vacation leave through May 2, 2008. Exs. 16 & 34 to Lee Decl.

On March 31, while at home, Conwright wrote a letter to Act One, Robinson's employment agency,"addressing the harassment. The purpose of the letter was to protect others from Robinson." *Id.* ¶ 28; *see also* Ex. 47 to Lee Decl. (copy of Conwright's letter). When it found out about the letter, the City began an investigation into whether Conwright violated its anti-discrimination policy, which provides in part that "[a]ll personnel involved in the investigation of a complaint are required to maintain confidentiality to the fullest extent possible." Ex. 17 to Lee Decl. at 8 (City of Oakland Administrative Instruction No. 71, "Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and

5

Complaint Procedure"). Conwright contends that she was not aware of this policy and never received any directive "to keep the harassment or [her] harassment complaint confidential." Conwright Decl. ¶ 28. The City ultimately concluded that Conwright violated the anti-discrimination policy and suspended her for several days. Ex. 30 to Lee Decl. (June 10, 2008 summary of administrative investigation recommending a five-day suspension); Conwright Decl. ¶ 43 (stating that she was suspended without pay for two weeks).

Upon her return to the office in May 2008, Conwright complains that she:

> was continually subjected to acts aimed at forcing me to retire. I was suspended, excluded from meetings that I had always attended, excluded from staff decisions, stripped of my status as a Manager and from performing my responsibilities and told not to even attempt to ask Smith or Renwick to return my duties; [sic] my work was repeatedly sabotaged including data on my computer being deleted and forcing me to redo substantial items of work over and over, my work was disapproved for no legitimate reason and I was falsely accused of misconduct including "over billing" customers, I was ostracized and repeatedly asked to retire up to the time when I finally completed retirement paperwork. I was constantly told by Renwick, Derania, and Smith that **"I *should really just retire.*"**

Conwright Decl. ¶ 41. She submitted evidence that what she perceives as a conspiracy to force her to retire began when she decided not to retire in 2007, and that Derania, Smith, and Renwick "engaged in a longstanding pattern of hostility towards me dating back to 2004." Conwright Decl. ¶ 38; *see also* Lenoir Decl. ¶ 6; Parker Decl. ¶ 5. The City denies that any of Conwright's job responsibilities were changed, or that she was ever excluded from any meetings. *E.g.*, Derania Decl. ¶¶ 20-25 (discussing Derania's concerns with Conwright's performance but noting that he met with Conwright to discuss the concerns, did not place a memo summarizing those concerns in her personnel file, and continued to work with her "on a variety of issues, including the budget, personnel issues and billing appeals"); *id.* ¶ 29 (stating that Derania "never purposely excluded [Conwright] from meetings or did not invite her to meetings"); Renwick Decl. ¶ 19 ("I did not notice any difference in Ms. Conwright's job duties after . . . May 2008.").

On July 9, 2008, Conwright filed a discrimination complaint with the California Department of Fair Housing and Employment ("DFEH"), and contends that she ultimately

6

"felt forced to retire by March 31, 2009." Conwright Decl. ¶¶ 44-45; *see also* Ex. 40 to Lee Decl. (memorandum and notice of voluntary resignation, effective March 31, 2009). She does not, however, raise a constructive discharge claim in this case.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings or materials in the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion. *Anderson*, 477 U.S. at 250.

**DISCUSSION**

**I.   Defendant Robinson**

The City argues in a footnote that Conwright never properly served Robinson, and that he should therefore be dismissed. Mot. at 13 n.20. Conwright has filed neither a proof

7

of service on Robinson nor a waiver under Federal Rule of Civil Procedure 4(d). She also failed to discuss the viability of maintaining Robinson as a Defendant in her opposition papers, and she has never requested an extension of time for service based on good cause. Accordingly, the Court now dismisses Robinson for lack of proper service under Federal Rule of Civil Procedure 4(m), leaving the City as the sole remaining Defendant.

**II.     Sexual Harassment and Hostile Work Environment**

Conwright does not dispute that her first two causes of action, for sexual harassment and hostile work environment under Title VII and California's Fair Employment and Housing Act ("FEHA"), are based on the same allegations and legal standards. To prevail on these causes of action, a plaintiff must show "that: 1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (internal quotation marks and citation omitted) (Title VII); *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (2006) (adopting Title VII standards for FEHA claims). The working environment must be both subjectively and objectively hostile. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Thus, the plaintiff must "subjectively perceive the environment to be abusive," *id.* at 21, and a "reasonable person with the same characteristics as the victim [must also] perceive the workplace as hostile" when considering "the totality of the circumstances," *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). "[W]hether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotation marks and citations omitted). "[T]he required showing of severity or seriousness of the harassing

8

conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

In this case, Conwright does not allege that Robinson ever touched her or made any sexual comments to her, with the possible exception of asking her out to dinner once. Instead, she contends that Robinson engaged in a regular pattern – several times a day over several weeks – of leering and winking at her, as well as following her around the office and going out of his way to be near her. It is clear that Conwright perceived this unwanted attention as pervasive conduct of a sexual nature. While not every person might perceive the alleged conduct in that manner, the Court cannot say, when viewing the facts in a light most favorable to Conwright, that no reasonable person would. "In close cases . . ., where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008). This is one such case, and the Court declines to grant summary judgment on grounds that Robinson's conduct did not rise to the level required to sustain a hostile work environment claim.

This, however, does not end the Court's inquiry. Under Title VII:

> An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct.
>
> If the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have "adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." On the other hand, an employer cannot be held liable for misconduct of which it is unaware. The employer's liability, if any, runs only from the time it "knew or should have known about the conduct and failed to stop it."

*Swenson v. Potter*, 271 F.3d 1184, 1191-92 (9th Cir. 2001) (internal citations omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). Similarly, under FEHA, "[h]arassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to

9

take immediate and appropriate corrective action." Cal. Gov't Code § 12940(j)(1). Thus, even if Robinson's actions constituted harassment, the City is liable only if it failed to take appropriate action.

After Conwright complained to the City on March 18, 2008, Robinson was told to stay away from Conwright and was moved to another floor that Conwright was not expected to visit. There is no evidence that Robinson and Conwright had any interactions after she complained, except that she claims he walked by her office once. Although Conwright claims that the investigation into her complaints was flawed, the "harassment stopped"; consequently, "liability cannot be premised on perceived inadequacies in the investigation." *Swenson*, 271 F.3d at 1197-98. Conwright also complains that the City did not grant her request to have Robinson removed from the building in which she worked, but, "[w]hen an employee accuses a fellow employee of sexual harassment, the employer must reconcile competing rights: the accuser's right to a harassment-free workplace and the accused's right not to be disciplined without fair procedures and sufficient proof of wrongdoing." *Id.* at 1188-89.

The Court need not decide whether the City's post-March 18 response was sufficient as a matter of law because the parties dispute when Conwright first voiced her concerns about Robinson to the City. If the jury were to believe Conwright, then she complained about Robinson's conduct to Smith on March 10, and the City did nothing. A reasonable juror could find this inaction to be inadequate, even if the City's response after March 18 might have been sufficient. Accordingly, the City's motion for summary judgment on Conwright's sexual harassment and hostile work environment claims is DENIED.

### III. Retaliation

Conwright next asserts that the City retaliated against her for complaining about sexual harassment and for filing discrimination charges, in violation of both Title VII and FEHA. The framework under both statutes is the same: First, the plaintiff must make out a prima facie case by showing that "(1) he engaged in a protected activity; (2) his employer

10

1  subjected him to an adverse employment action; and (3) a causal link exists between the
2  protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.
3  2000) (Title VII); *see also Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005)
4  (FEHA).[3]  "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the
5  defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray*, 217 F.3d
6  at 1240; *see also Yanowitz*, 36 Cal. 4th at 1042.  The legitimate nondiscriminatory reason
7  need not be objectively true; courts "only require that an employer honestly believed its
8  reason for its actions, even if its reason is foolish or trivial or even baseless." *Johnson v.*
9  *Nordstrom, Inc.*, 260 F.3d 727, 733 (9th Cir. 2001) (internal quotation marks and citation
10 omitted).  "If the defendant articulates . . . a [legitimate nondiscriminatory] reason, the
11 plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a
12 discriminatory motive." *Ray*, 217 F.3d at 1240; *see also Yanowitz*, 36 Cal. 4th at 1042.
13 "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence
14 must be both specific and substantial." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,
15 1062 (9th Cir. 2002).

16         In this case, the City does not contest that Conwright's reports of harassment by
17 Robinson to the City and her DFEH discrimination claim constitute protected activity. The
18 Court now examines in turn Conwright's two sets of alleged adverse actions, which she
19 refers to as the "backwards investigation" or "backwards disciplinary action" and the
20 "retirement conspiracy."

21         **A.     "Backwards investigation" or "backwards disciplinary action"**

22         The Court assumes, without deciding, that Conwright can make out a prima facie case
23 that the investigation into whether she violated the City's confidentiality policies and the
24 discipline that followed were the result of retaliation for Conwright's protected activity.  The

---

[3]The definition of "adverse action" is slightly broader under Title VII, with FEHA requiring that the act "must materially affect the terms, conditions, or privileges of employment to be actionable," *Yanowitz*, 36 Cal. 4th at 1052, but Title VII allowing a retaliation claim to be premised on an act that a reasonable person would find to be materially adverse – i.e., an act that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).

11

1  City has offered a legitimate nondiscriminatory reason for that investigation and its results:
2  namely, that Conwright's letter to Act One violated the City's anti-discrimination policy.
3  Thus, the burden shifts back to Conwright to show that this was a pretext for retaliation.
4        Conwright fails to meet that burden.  She contends that she was never told to keep
5  matters confidential, but the record demonstrates both that she received training on the policy
6  on December 6, 2007, Ex. 18 to Lee Decl. (sign-in sheet for training), and that she was
7  specifically told in an email from Jeffries, the EOPD manager, that he "would also appreciate
8  your helping us maintain the confidentiality of the investigative process," Ex. 3 to Conwright
9  Decl. at 2.  Moreover, Conwright relies only on the timing of the allegedly retaliatory acts,
10 which began days after she initially complained about Robinson.  Although "temporal
11 proximity between an employer's knowledge of protected activity and an adverse
12 employment action [may be] sufficient evidence of causality to establish a prima facie case,"
13 Conwright has cited no authority to support her position that proximity alone is sufficient to
14 demonstrate pretext after the employer has submitted evidence of a legitimate basis for its
15 decision. *Breeden*, 532 U.S. at 273; *see also Morgan v. Regents of Univ. of Cal.*, 88 Cal.
16 App. 4th 52, 69-70 (2000) (explaining that "proximity in time between the protected action
17 and allegedly retaliatory employment decision" may be evidence of the causality prong of a
18 prima facie retaliation case (internal quotations, alteration, and citations omitted)).
19 Conwright has failed to present specific and substantial evidence to rebut the City's proffered
20 legitimate nondiscriminatory reason for its investigation and resulting discipline, and
21 summary judgment on Conwright's retaliation claim based on these acts is therefore proper.
22       **B.**    **"Retirement conspiracy"**
23     As to the acts Conwright contends were in furtherance of the "retirement conspiracy"
24 against her, not all of the acts constitute adverse employment actions.  For example, "snide
25 remarks" and "increased criticism" are not adverse employment actions. *Hardage v. CBS*
26 *Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005).  Additionally, "mere ostracism in the
27 workplace is not enough to show an adverse employment decision." *Strother v. S. Cal.*
28 *Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996).  However, being excluded from

12

work-related meetings can be an adverse employment action, *id.*, as can being "stripped of work responsibilities," *Kortan v. Cal. Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2000). The City denies that any of these things happened, but the Court must view the evidence in a light most favorable to Conwright at this stage of the proceedings. As noted above, temporal proximity is enough to establish the necessary causal link for a plaintiff's prima facie case. Thus, the Court finds that Conwright has stated a prima facie case of retaliation.

Perhaps because the City denies that Conwright's job duties changed and that she was ever excluded from meetings, the City does not offer any nondiscriminatory reason for such changes. The City does present evidence that Derania had concerns about Conwright's performance, but Derania raised these concerns with Conwright in a meeting, did not place a memo expressing his concerns in her personnel files, and "did not intend for the meeting to be a disciplinary action"; he "only wished to let her know that the issues existed, to ask that she rectify them, and to ask that she exert more control over her staff's work product." Derania Decl. ¶¶ 20-24. The Court therefore does not construe evidence of Conwright's potential performance issues as a legitimate nondiscriminatory reason for material changes in her workplace responsibilities.

Moreover, even if the Court were to construe Derania's concerns as a legitimate reason for changes in Conwright's duties, Conwright has presented sufficient evidence to create a material dispute over whether those concerns were pretextual. She presents evidence that she did not have any performance issues, which is circumstantial evidence that the City might not have honestly believed that she did. In addition, although Conwright contends that Derania, Smith, and Renwick began to conspire to remove her duties after she changed her mind about retiring in 2007 – before she engaged in any protected activity – this does not necessarily establish that Conwright was not subject to unlawful retaliation. A reasonable juror might well conclude that Conwright's protected activity caused additional adverse actions that would not have occurred in the absence of such activity.

Consequently, the Court finds it proper to DENY summary judgment on Conwright's claims that she was unlawfully retaliated against based on a material change in her job

13

responsibilities, including being excluded from work-related meetings. Conwright may not, however, recover based on ostracism or being subjected to unfavorable comments about when she would retire; these are insufficient to constitute adverse actions.

### IV. Age Discrimination

Finally, Conwright alleges age discrimination, arguing that the so-called "retirement conspiracy" was successful only because of her age. However, Conwright acknowledges that the City's retirement plan was based on years of service and not age. Although an older person might be more likely to have sufficient years of service to be able to retire, "an employee's age is analytically distinct from his years of service. . . . [A]n employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). Thus, even if, as Conwright contends, she was treated differently because she was eligible for retirement based on her years of service, that does not, in the absence of any additional evidence – which Conwright fails to present – establish disparate treatment based on age. Consequently, the Court GRANTS summary judgment to the City on Conwright's age discrimination claim.

**CONCLUSION**

In accord with the above discussion, IT IS HEREBY ORDERED that:

1. Defendant Robinson is DISMISSED without prejudice pursuant to Federal Rule of Civil Procedure 4(m).

2. Defendant City of Oakland's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is DENIED as to Conwright's sexual harassment and hostile work environment claims, and as to Conwright's retaliation claim based on material changes in her job responsibilities after she filed her complaints about Robinson and her DFEH complaint. Summary judgment is GRANTED as to Conwright's age discrimination claim and her retaliation claim based on the investigation of her letter to

Act One, the discipline resulting from that investigation, and claims that she was ostracized and subject to unwelcome remarks about when she would retire.

**IT IS SO ORDERED.**

Dated: 01/20/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT